### SEYMOUR v. CANFIELD.

REAL-ESTATE BROKER—CONTRACT—EVIDENCE.
Evidence reviewed, and *held* not to establish an alleged agree
ment by defendant to purchase, through complainant, certain
timber lands on which complainant claimed to have an
option.

Appeal from Manistee; McMahon, J. Submitted October 4, 1899. Decided December 12, 1899.

Bill by Richard A. Seymour against John Canfield for
an accounting. From a decree dismissing the bill, complainant appeals. Affirmed.

*Judkins & Perkins* (*Crane, Norris & Stevens* and *George L. Hilliker*, of counsel), for complainant.

*Hanchett & Hanchett* (*Fitz Gerald & Barry*, of counsel), for defendant.

HOOKER, J. The bill of complaint in this cause is filed
for an accounting, and claims a large sum to be due to the
complainant. The dispute arises over a sale of lands, for
convenience called the "Long Lake Group," which, at the
time negotiations commenced, belonged to Hannah, Lay
& Co., of Traverse City. Torrent, of Muskegon, had
some sort of a verbal order or option upon them. Lunney, who was in the employ of Torrent, is alleged to have
obtained from Torrent a written refusal of the property
for the period of 10 days, and to have arranged with
Richard Seymour to aid him in finding a purchaser for it,
commissions to be divided equally between them. Seymour had negotiations with the defendant, Canfield,—
both being residents of Manistee,—and the latter sent
estimators upon the land. Seymour claims that subsequently an agreement was made that Canfield should buy

the timber and pay $400,000 for it, and that Seymour should care for the property until sold, and have half the profits, after paying Canfield 6 per cent. interest upon the investment and other funds advanced.    Later, Canfield refused to purchase the land, and within a few days it was bought by Filer, a fellow townsman and friend of Canfield; title being taken in the name of Filer.    It was kept for several years, and ultimately sold for $850,000.    The complainant now claims a share of the profits.    This is an outline, merely, of the case from the complainant's standpoint, and allusion to the testimony tending to establish or dispute the claim is purposely omitted in the statement. The circuit judge filed a lengthy opinion, which gives the case in detail, and discusses the evidence at length.    Upon most of the disputed questions of fact he finds with the complainant, but dismisses the bill.    The record contains 1,075 pages; and the briefs, 552 pages.    Upon some points the evidence is circumstantial, and the briefs necessarily contain a much fuller discussion of the questions involved, and the reasons which should lead to the one or the other conclusion, than we can be expected to incorporate in any opinion we may write; and we shall have to omit the discussion of many circumstances that counsel attach much importance to, with the simple statement that we have attempted to give each of them the full weight to which it is entitled.    At the same time, we will, in a general way, give our reasons for our conclusions, though, being mainly a question of fact, a very brief opinion would ordinarily suffice.

The important questions appear to be the following, viz. :

1. What were the dates, duration, and character of the alleged option given by Torrent, and its renewals?

2. What contract was first made with Canfield, and how should it be construed?

3. Was a second contract made between Seymour and Canfield, and, if so, what were its terms, and how should they be construed?

4. Did Canfield wrongfully refuse to perform this alleged second contract?

5. Did he fraudulently procure the timber, or any part of it, through Filer?

6. If so, has the complainant a right to share the profits, if any were made by Canfield?

We will not take these up in their numerical or chronological order, but will examine first the arrangement made when Canfield's attention was called to the matter. This appears to have been done by one O'Brien, an impecunious man, whose only connection with the transaction arose from a conversation which he overheard between the complainant and his brother John in relation to some land which they hoped to get an option upon, and which bore over 100,000,000 feet of pine. Next day he saw complainant, and told him that he had a party who had plenty of money, and who would buy a large group of timber. He asked where this group was, but Seymour refused to tell him, and said he was going to have a refusal of this group, and did not want to say anything about it until it was secured. According to O'Brien's testimony, he saw Seymour again, and obtained his consent that he might speak to Canfield about it, which he did, and Canfield asked him to bring Dick Seymour down there. O'Brien and Seymour agree that, after obtaining an option, they went to see Canfield. There is nothing in Seymour's testimony that tends to show that Canfield did more than to say that he would be to the expense of sending an estimator to the land if he could be assured that he could purchase the land if found satisfactory to him. Seymour himself said that he took the refusal to Canfield, together with an estimate made for Torrent, which was shown to have been 116,000,000, and told him that Hannah, Lay & Co. had it estimated at 112,000,000, and that he had estimated it himself, and made more. He afterwards stated that he made it between 119,000,000 and 120,000,000 feet. There is testimony in the case that he said he made it 130,-000,000. He testified further that Canfield said that the time was too short to look over this, and he told Canfield that he thought it unnecessary for him to go all over the

land, and that he had made an estimate of the land, and knew the timber was there.   He further testified:

"Canfield said, 'Can't you get that extended?' and I said, 'I will try to get it extended.'   Then he asked me what I wanted to get out of this, and I told him I wanted 10 cents a thousand, by the estimate he was having copied; and he said, 'Jim O'Brien, what do you want?' and Jim O'Brien said, 'I want $5,000.'

"*Q.* What, if anything, was said at that time about other purchasers of the land?

"*A.* Mr. Canfield asked me if I had sought any others, or was going to seek any others.   I said: 'No; if you will send your men right there to look this up, I will trust to your buying it.'   He said, 'My man is here, and I will send him in the morning.'   *   *   *

"*Q.* What did Mr. Canfield say with reference to his buying the land?

"*Mr. Fitz Gerald:* I object to it as leading.

"*A.* Mr. Canfield said he was in the market for pine, and he had the money to buy it and pay for it, if it was a good thing.   He also told me: 'Now,' he says, 'I don't want to send my man there unless you will keep away from going anywhere else.'   He said, 'I don't want to be put to any expense.'   I said: 'All right.   If you want to buy this, you can have the first chance at it.   Now, send your man.'   He said he would send him in the morning, and I know he did send him."

This is the substance of the testimony on behalf of the complainant in relation to this interview, except that the price asked was $400,000, as it was said to have been fixed by the refusal.   We think that it shows that Canfield consented to send an estimator, on condition that he could have an assurance that he could buy the timber in case he should want to do so after getting his estimate, and there is nothing to show that he promised to take the land unless he should choose to do so.

The next important question relates to the alleged second contract.   The witnesses who testify to this are the two Seymours and Goldsborough.   If we take their testimony to be true, we are still unable to find an unconditional agreement to purchase this timber for $400,000,

in the face of Canfield's explicit denial, and other circumstances which show the improbability of the testimony. In the first place, the cross-examination of Goldsborough is such as to discredit him, while ten or a dozen witnesses were produced who unqualifiedly testified that the reputation of the Seymours for truth and veracity was bad. About as many were called by the complainant, who testified that the reputations of these men were good. It cannot, therefore, be said that they stand impeached, but they are in a measure discredited by the fact that a number of apparently respectable persons were found who would testify to their bad reputations. There are, however, some circumstances which have an important bearing. It will be remembered that Canfield insisted upon having an estimate made before he would purchase, notwithstanding the fact that Seymour wanted him to act on information imparted by him. It is clear that the estimators did not start until the 29th or 30th of September, while this alleged agreement is said to have been made on the 8th of October. The estimators returned about the 12th or 13th. Hence, while Canfield may have had some reports from them, they were not complete. Again, it is a significant fact that the contract was not closed up, which there was no occasion for postponing, if, as counsel for the complainant contend, it was not conditioned on finding the quality and quantity of timber as represented. If, in the first talk, there was any promise to buy at all, it was clearly conditioned upon the amount of timber that should be found by Canfield's estimator, and no adequate reason is shown for believing that Canfield changed his mind or made a different promise before getting the estimate. Again, Seymour's next interview does not indicate that he was then claiming that Canfield had made an unconditional agreement to purchase. He claims to have asked Canfield if he had heard from his inspectors; and again, after the inspectors had returned, and he had been told by Canfield that the inspection did not turn out as well as expected, he replied, "This is the last day of the

·option." He then asked Canfield, "What have you made up your mind to do about it?" He testified further:

"I asked him if he was ready to purchase it, and had made up his mind. He said, 'No.' I told him it was kind of bad for me, waiting with the expectation of his purchasing the timber, and not seeing anybody else. It left me unable to do anything. He then said he would make me an offer of $325,000 spot cash. I wired that offer in."

The same day Seymour showed him a telegram refusing this offer, and stating that an offer of $400,000 had been made by others. Some days afterwards he and O'Brien went to see Canfield, and O'Brien claimed that Canfield had bought it, and demanded his commission. If it is true that Seymour and Canfield made the contract relied upon, it would seem natural that Seymour should have said something about it at these several interviews, and that he, as well as O'Brien, should have claimed commission.

In any view of the case that we can take, the testimony of these witnesses fails to show the alleged unconditional agreement. It indicates merely that a change of consideration was agreed upon, leaving Canfield under no greater obligation than to take the timber if found equal to the representations as to quantity and quality. Another convincing circumstance is that, to sustain the complainant's claim, it is necessary to find that Canfield was willing to invest the same amount of money, to get half of the prospective profits, as the whole. His risk was substantially the same, because he was not entitled to reimbursement in case of loss. We are asked to believe that the motive was to save paying commissions amounting to $11,000 or $12,000. This is a most improbable proposition to come from a man of Canfield's alleged sagacity. These and other circumstances not only lead us to conclude that the alleged contract is not supported by a preponderance of proof, but beget a profound conviction that no such contract was made. As this is sufficient to dispose of the

case, we might omit further discussion, but we will allude to one or two other matters.

We do not agree with the learned circuit judge that a written refusal at a price of $400,000 was ever in Seymour's possession. Like many other important papers, it is said to have been lost; and there is no satisfactory evidence that Seymour ever sought to preserve it, although it is claimed to have been in Lunney's safe for a long time after it became apparent that it was an important paper. The existence of this paper is said to be proved by Lunney, the two Seymours, O'Brien, and Ellis. The circuit judge held explicitly that Lunney was unworthy of belief, and we are not satisfied that he was wrong about it. O'Brien did not read it; he only saw it, and heard Seymour read it. Ellis says that a paper was brought to him to examine, and, while he is not able to be very definite, he thinks it was a paper signed by Torrent, giving a right to buy timber for a large price,—$300,000 or $400,000, probably the latter,—upon the "Long Lake Group," so called. He says it was signed by Torrent and Lunney, which nobody else claims. On the other hand, Torrent says he gave no written refusal, and that he did not offer the lands for less than $4 per 1,000 feet stumpage to any one until he sold to Filer. Lunney testified in a former suit against Petrie, where he sought to recover somewhere from $6,000 to $12,000 as commissions for bringing about the sale to Filer, in which he admits that Seymour had a half interest, that the option was verbal. Haines, a partner of Torrent, of whom Seymour made some inquiries in relation to the matter, testified that Seymour said the price was $4 per 1,000 feet, and made no claim that Torrent offered it for $400,000; while Canfield says he was asked $4 per 1,000 feet, and that their negotiations were upon that basis.

If we were to say that Canfield was under obligations to take the timber in case his estimate should show the existence of 112,000,000, 116,000,000, 119,000,000, or 130,-000,000 feet, we would have to say that an estimate show-

ing 103,000,000 feet would not require him to do so, and he would not be precluded from buying upon other terms from other parties.    It is said that, under the original bargain, he would have paid about $410,000 for the timber.    Conceding that Filer bought it for him at his request, the amount paid was $10,000 less than Seymour would sell it to him for, and he had a legal right to buy it. But he did not buy it.    Filer had at least a half interest at all times, and if Canfield interested Filer, and was willing to take one-half at $200,000, instead of the whole at $410,000, it was nothing more than he had a lawful right to do.    We need not, therefore, concern ourselves with the alleged concealment of Canfield's true relations to the property or to Filer.

The decree of the circuit court is affirmed, with costs.

The other Justices concurred.